UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
T-MOBILE NORTHEAST LLC,

                     Plaintiff,                     <u>REPORT AND
RECOMMENDATION</u>

           -against-                          CV 09-5670 (SJF)(ETB)

THE INCORPORATED VILLAGE OF EAST HILLS
and the ZONING BOARD OF APPEALS OF THE
INCORPORATED VILLAGE OF EAST HILLS,

                     Defendants.
-----------------------------------------------------------------------X

TO THE HONORABLE SANDRA J. FEUERSTEIN, United States District Judge:

       Before the Court is the plaintiff's motion for summary judgment, pursuant to Federal

Rule of Civil Procedure 56, seeking judgment as a matter of law with respect to all of the claims

alleged in the Complaint. Defendants oppose the motion. For the following reasons, I

recommend that plaintiff's motion for summary judgment be granted in its entirety.


<u>FACTS</u>

       The facts set forth herein are taken solely from the plaintiff's Rule 56.1 statement. As

plaintiff points out in its Reply Memorandum of Law, the defendants failed to comply with Local

Civil Rule 56.1(b), which requires that the party opposing a motion for summary judgment

submit a counter-statement that "include[s] a correspondingly numbered paragraph responding to

each numbered paragraph in the statement of the moving party." Local Civ. R. 56.1(b). Rather

than respond to the paragraphs contained in plaintiff's 56.1 statement, defendants' submission

simply sets forth their own statements of material fact. While plaintiff's 56.1 statement consists of 171 numbered paragraphs, defendants counter-statement only contains 48 numbered paragraphs, none of which correspond to the numbered paragraphs contained in plaintiff's 56.1 statement. Moreover, none of the statements contained in defendants' 56.1 statement controvert those set forth in plaintiff's 56.1 statement, as required by Local Civil Rule 56.1(c). Accordingly, the statements contained in plaintiff's 56.1 statement are deemed admitted for purposes of the within motion. See Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted . . . unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); see also Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

This action arises out of an application by the plaintiff, T-Mobile Northeast LLC ("T-Mobile"), to defendants, the Incorporated Village of East Hills (the "Village") and the Zoning Board of Appeals for the Village (the "ZBA"), for approval to install eight public utility wireless telecommunications antennas on the rooftop and related electrical equipment in the basement (referred to as the "Proposed Facility") of an existing building located in the Village (the "Premises"). (Pl. Local Civ. R. 56.1 Statement ("Pl. 56.1") ¶¶ 1-2.) On December 1, 2009, defendants rejected plaintiff's application.

T-Mobile is a "communications common carrier" and a telecommunications carrier providing "commercial mobile services," "commercial mobile radio services," "personal

communication services," and "personal wireless services."  (Pl. 56.1 ¶ 3.)  T-Mobile is a wholly owned subsidiary of T-Mobile USA, Inc. and uses Federal Communications Commission ("FCC") licenses issued to T-Mobile USA, Inc. and its affiliates to provide personal wireless service within the state of New York, including Nassau County and the Village of East Hills. (Pl. 56.1 ¶ 4.)

In order to provide reliable service to its customers, as per its obligations under its FCC licenses, T-Mobile must create a network of individual but interconnected "cell sites," which are antenna facilities consisting of radio antennas installed on existing buildings or other structures, such as towers or monopoles, and equipment that sends and receives radio signals to and from customers' portable wireless communication devices.  (Pl. 56.1 ¶ 6.)  If there are too few cell sites or if cell sites are located too far apart, T-Mobile's customers may experience unreliable service such as calls that are disconnected, static and difficulty placing and maintaining calls. (Pl. 56.1 ¶ 10.)

T-Mobile sought permission to build its Proposed Facility due to the fact that it is experiencing what it deems to be a "significant" service gap in the Village, resulting in T-Mobile's failure to provide reliable service to the area.  (Pl. R. 56.1 ¶ 11.)  T-Mobile has determined that building the Proposed Facility at the Premises would help to eliminate this service gap.  (Pl. R. 56.1 ¶ 12.)  T-Mobile's Proposed Facility consists of eight small panel antennas mounted to six mounts on the roof of the existing building at the Premises.  (Pl. 56.1 ¶ 2.)  T-Mobile also seeks to install related electrical equipment in the building's basement.  (Id.)

Two other wireless telecommunications providers - Sprint Spectrum, LLP ("Sprint") and Verizon - already have Village-approved public utility wireless telecommunications facilities

located on the rooftop of the Premises.[1]  (Pl. 56.1 ¶ 16.)  Height variances were issued to both

Sprint and Verizon by the Village to allow them to install their roof antennas on the Premises.

(Pl. 56.1 ¶ 19.)  In 2001, a third wireless telecommunications provider - Nextel of New York,

Inc. ("Nextel") - was also approved by the Village to install a wireless telecommunications

facility at the Premises, consisting of twelve roof-mounted antennas and related electrical

equipment housed in the basement of the building.  (Pl. 56.1 ¶ 17.)  However, Nextel did not

proceed with the installation of its proposed facility.  (Pl. 56.1 ¶ 18.)

     Prior to making its application to install the Proposed Facility on the Premises, T-Mobile

approached the Village about collocating on an existing tower (the "Tower") located on Village-

owned property near the Village Hall.  (Pl. 56.1 ¶¶ 21-22.)  The Village rejected T-Mobile's

proposal.  (Pl. 56.1 ¶ 22.)  Accordingly, on July 11, 2008, T-Mobile submitted an application for

a Building Permit to construct the Proposed Facility at the Premises.  (Pl. 56.1 ¶ 22.)  The

Village's Building Department issued a denial letter on July 25, 2008, advising T-Mobile that its

application required "review by the Village of East Hills Planning Board" (the "Planning

Board").  (Pl. 56.1 ¶ 24.)  T-Mobile submitted an application to the Planning Board on August

26, 2008.  (Pl. 56.1 ¶ 25.)

     On February 12, 2009, the Building Department issued a revised denial letter, informing

T-Mobile that its application no longer required review by the Planning Board.  (Pl. 56.1 ¶ 27.)

Instead, the revised denial letter advised T-Mobile that it needed to obtain approval from the

ZBA.  (Id.)  T-Mobile submitted its application to the ZBA on February 18, 2009, seeking to

---

[1]  Sprint maintains three antennas mounted on three mounts at the Premises.  Verizon
maintains nine antennas mounted on six mounts.  (Pl. 56.1 ¶ 16.)  T-Mobile seeks to install eight
antennas mounted on six mounts.  (Pl. 56.1 ¶ 2.)

obtain height and use variances as well as a special exception permit.  (Pl. 56.1 ¶ 35.)

After several adjournments, a public hearing was held before the ZBA on June 16, 2009 and continued on July 28, 2009, August 18, 2009 and September 22, 2009.  (Pl. 56.1 ¶ 72.)  On July 14, 2009 - after the first date of the public hearing and prior to the second - T-Mobile renewed its proposal to collocate its wireless telecommunications facility on the Tower located on Village property.  (P. 56.1 ¶ 101.)  The Village again rejected T-Mobile's proposal.  (Id.) During the course of the public hearing, T-Mobile's counsel presented its application to install the Proposed Facility at the Premises, supported by the testimony of multiple witnesses as well as numerous exhibits.  (Pl. 56.1 ¶¶ 73, 108, 111.)  The Village also called its own consultant to testify in opposition to the Proposed Facility.  (Pl. 56.1 ¶ 128.)

On December 1, 2009, the ZBA issued its decision (the "Decision") denying T-Mobile's application to construct the Proposed Facility at the Premises.  (Pl. 56.1 ¶ 166.)  In rendering its Decision, the ZBA held that "[o]n balance, the perceived and claimed benefit, if any, to [T-Mobile] are [sic] outweighed by the detriment posed to the Village community's health, safety, and welfare."  (Pl. 56.1 ¶ 168.)  The ZBA further stated that "no justification has been offered for why an acknowledged eyesore in the community should be made worse" and that the "benefit to T-Mobile, if any, . . . has not been demonstrated."  (App.[2] 957-958.)  In addition, the ZBA found that "the evidence about a [service] gap is equivocal at best, depending upon whether T-Mobile's hearing consultants or marketing to the public representations are credited."  (App. 958.) According to the ZBA, based on the record before it, "whether there is a gap in T-Mobile service

_____

[2]  Citations to "App." refer to the Appendix submitted by plaintiff in connection with the instant motion.

has not been proven and, even if one may exist, other service providers have installations on the Building."  (App. 958.)

The ZBA based its Decision in part upon the impact the Proposed Facility would have on the aesthetic character of the Village, finding that "[t]he existing negative aesthetic impact of the Building upon surrounding Village neighborhoods should not be exacerbated.  As is, the Building is completely out of character with the Village.  What [T-Mobile] request[s] is Board approval to worsen a continuing adverse effect and/or negative impact in neighborhood aesthetic conditions."  (App. 958.)

The ZBA also relied on the effect the Proposed Facility would have on real estate conditions in the Village as support for its Decision, stating that "[t]o the Board, it seems obvious that having an unsightly commercial building, the largest in the Village, in close proximity to residential homes will have a negative impact upon the marketability and prices of such homes." (App. 959.)  Taking note of a petition filed by local real estate brokers and agents asserting that installation of the Proposed Facility would "have a negative impact on nearby home prices," the ZBA found that "[i]f many brokers in the Village believe that sale prices will drop if the [Proposed] Facility is installed, it will be a self-fulfilling prophecy."  (App. 959.)  The ZBA accordingly held that T-Mobile's "requests for relief from the Village's Zoning Code are denied."  (App. 960.)

T-Mobile thereafter commenced the within action on December 29, 2009.

I.    Legal Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The burden is on the moving party to establish the lack of any factual issues.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The very language of this standard reveals that an otherwise properly supported motion for summary judgment will not be defeated because of the mere existence of some alleged factual dispute between the parties.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  Rather, the requirement is that there be no "genuine issue of material fact."  Id. at 248.

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986).  When the moving party has carried its burden, the party opposing summary judgment must do more than simply show that "there is some metaphysical doubt as to the material facts."  Id. at 586.  Under Rule 56(e), the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing there is a genuine issue for trial."  Anderson, 477 U.S. at 248.

When considering a motion for summary judgment, the district court "must also be 'mindful of the underlying standards and burdens of proof' . . . because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  SEC v. Meltzer, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006) (quoting Brady

v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988)) (internal citations omitted). "Where the non-moving party would bear the ultimate burden of proof on an issue at trial, the burden on the moving party is satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim." Meltzer, 440 F. Supp. 2d at 187.

II.     The Telecommunications Act

The Telecommunications Act of 1996 ("TCA") is "an omnibus overhaul of the federal regulation of communications companies," the purpose of which is to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services . . . by opening all telecommunications markets to competition . . . ." Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 637 (2d Cir. 1999) (quoting H.R. Conf. Rep. No. 104-458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124)). "In furtherance of this goal, Congress enacted 47 U.S.C. § 332(c)(7) which limits the state and local government's authority to deny construction of wireless telecommunications towers, see id. § 332(c)(7)(B)(i), and regulates how such decisions must be made." Willoth, 176 F.3d at 637 (citing 47 U.S.C. § 332(c)(7)(B)(ii-iv)). While local governments still retain zoning authority over the siting of wireless facilities, "the method by which siting decisions are made is now subject to judicial oversight." Willoth, 176 F.3d at 637 (quoting Cellular Tel. Co. V. Town of Oyster Bay, 166 F.3d 490, 493 (2d Cir. 1999)). Accordingly, courts review denials subject to the TCA "more closely than other types of zoning decisions to which federal courts generally accord great deference." Willoth, 176 F.3d at 637 (citation omitted).

-8-

III.     Plaintiff's Causes of Action

    A.     The ZBA's Decision is not Supported by Substantial Evidence

Pursuant to the TCA, denials by a local zoning authority must be supported by substantial evidence.  See 47 U.S.C. § 332(c)(7)(B)(iii); see also Town of Oyster Bay, 166 F.3d at 494.  Substantial evidence has been described as "less than a preponderance, but more than a scintilla of evidence."  Town of Oyster Bay, 166 F.3d at 494; Omnipoint Commc'ns, Inc. v. Town of Lagrange, 658 F. Supp. 2d 539, 554 (S.D.N.Y. 2009).  Put another way, substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Town of Oyster Bay, 166 F.3d at 494 (quoting Universal Camera v. NLRB, 340 U.S. 474, 477 (1951)).

In determining whether a zoning authority's denial is supported by substantial evidence, the court "must employ the traditional standard used for judicial review of agency actions."  Town of Oyster Bay, 166 F.3d at 494 (quotation omitted).  The standard of review is a deferential one and the court "may neither engage in [its] own fact-finding nor supplant the Town Board's reasonable determinations."  Id. (citation omitted).  The record should be viewed in its entirety, however, "including evidence opposed to the Town's view."  Id. (citing American Textile Mfr. Inst., Inc. v. Donovan, 452 U.S. 490, 523 (1981)).

Under New York law, "cellular telephone companies . . . are classified as 'public utilities' for purposes of zoning applications."  Town of Lagrange, 658 F. Supp. 2d at 555 (quoting Omnipoint Commc'ns, Inc. v. Common Council of Peekskill, 202 F. Supp. 2d 210, 222 (S.D.N.Y. 2002)); see also Cellular Tel. Co. v. Rosenberg, 82 N.Y.2d 364, 371 (concluding that a cellular telephone company is a "public utility").  Accordingly, "[a] zoning board of appeals has

a narrower range of discretion in dealing with special permit applications filed by utilities than is true in the case of the generality of applications." Town of Lagrange, 658 F. Supp. 2d at 555 (citing Common Council of Peekskill, 202 F. Supp. 2d at 222).

Under the "public necessity" standard enunciated in Consolidated Edison Co. v. Hoffman, 43 N.Y.2d 598 (1978), a public utility must demonstrate that "(1) its new construction 'is a public necessity in that it is required to render safe and adequate service;' and (2) 'there are compelling reasons, economic or otherwise,'" for its construction. Town of Lagrange, 658 F. Supp. 2d at 555 (quoting Rosenberg, 82 N.Y.2d at 372). Accordingly, "a local board must evaluate a cellular telephone company's application for a variance on the basis of whether the public utility has shown a need for its facilities and whether the needs of the broader public would be served by granting the variance." Sprint Spectrum, L.P. v. Board of Zoning Appeals of Town of Brookhaven, 244 F. Supp.2d 108, 114 (E.D.N.Y. 2003). "[W]here the intrusion or burden on the community is minimal, the showing required by the utility should be correspondingly reduced." Hoffman, 43 N.Y.2d at 611.

Here, the ZBA based its denial of T-Mobile's application on the following reasons:

> (1) "the perceived and claimed benefit, if any, to [T-Mobile] are [sic] outweighed by the detriment posed to the Village community's health, safety and welfare";

> (2) "[t]he existing negative aesthetic impact of the Building upon surrounding Village neighborhoods should not be exacerbated" and that approval of T-Mobile's application would "worsen a continuing adverse effect and/or negative impact in neighborhood aesthetic conditions";

> (3) "it seems obvious that having an unsightly commercial building, the largest in the Village, in close proximity to residential homes will have a negative impact upon the marketability and prices

of such homes";

> (4) T-Mobile has not demonstrated a need for its Proposed Facility because "the evidence about a [coverage] gap is equivocal at best" in that "even in the so-called gap, cell phone calls can be made, received, and maintained" and "the record establishes that there are at least two other cell phone providers with installations on the Building."[3]

(App. 957-59.)

1.    Health Concerns

Pursuant to 47 U.S.C. § 332(c)(7)(B)(iv), "health concerns expressed by residents cannot constitute substantial evidence."  Town of Oyster Bay, 166 F.3d at 494; see also 47 U.S.C. § 332 (c)(7)(B)(iv) ("No . . . local government . . . may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [FCC's] regulations concerning such emissions.").  The Village appears to acknowledge this fact by stating in its Decision that "[s]ome residents . . . raised generalized health concerns despite the Board's and T-Mobile's repeated references to the Federal Telecommunications Act of 1996, 47 U.S.C. § 332 (the "Act") and FCC regulations as setting forth the applicable standards."  (App. 955.)  Yet, in denying T-Mobile's application, the ZBA explicitly stated that "[o]n balance, the perceived and claimed benefit, if any, to [T-Mobile] are [sic] outweighed by the detriment posed to the Village community's health, safety, and welfare.  (App. 957.)

---

[3]  The Court notes that the quoted language taken directly from the ZBA's Decision herein is verbatim the language used by defendants to deny an application for variances by another wireless service provider in MetroPCS New York, LLC v. Vill. of East Hills, No. 09-CV-4636, 2011 U.S. Dist. LEXIS 6479, at *9-10 (E.D.N.Y. Jan. 20, 2011).  The Court further notes that the facts of MetroPCS are nearly identical to those herein, so much so that the same witnesses testified at the ZBA hearings in both actions.

A review of the record demonstrates that T-Mobile presented uncontroverted evidence that the radio frequency emissions of the Proposed Facility would fall well within applicable FCC guidelines.  (App. 192-227.)  Notwithstanding this fact, multiple community members voiced concerns about what they perceived to be the possible health risks associated with the construction of T-Mobile's Proposed Facility.  (App. 510-16, 527-31.)  The Village argues in its memorandum of law in opposition to plaintiff's motion that "[t]he Board . . . did not rely on the Resident's [sic] submissions that related to the health effects of cellular antennas" and that "[t]he Village's decision does not mention health risks as a reason for the denial of Plaintiff's application."  (Def. Mem. of Law 26-27.)  Yet, as set forth above, the ZBA clearly stated in the "Determination" section of its Decision that any benefit to T-Mobile in building the Proposed Facility was "outweighed by the detriment posed to the Village community's health, safety, and welfare."  (App. 957.)

While it is true that raising health concerns does not violate the TCA, see Town of Oyster Bay, 166 F.3d at 495, based on the language in the ZBA's Decision, "health concerns undoubtedly played a role in both the community opposition T-Mobile faced during the application process as well as the [ZBA's] decision . . . to deny it a permit."  T-Mobile Northeast LLC v. Town of Ramapo, 701 F. Supp. 2d 446, 461 (S.D.N.Y. 2009).  Even though the ZBA acknowledged in its Decision that the residents' health concerns would be an impermissible ground for denying T-Mobile's application under the TCA, "the Board still cited health risks as a ground for its decision."  Id.  While the Court cannot conclude whether the perceived health risk was the main reason for denying T-Mobile's application, "[s]uffice it to say the record reflects that it was a significant reason - and a prohibited reason under the TCA."  Id.

Accordingly, the Court finds that the ZBA's determination that any benefit to T-Mobile in constructing its Proposed Facility is "outweighed by the detriment posed to the Village community's health, safety, and welfare" is not based on substantial evidence. See MetroPCS, 2011 U.S. Dist. LEXIS 6479, at *39 (finding that, where the ZBA issued a decision containing the exact same language, it "may not rely upon testimony and evidence presented at the hearings concerning the possible health and safety effects of the radio emissions").

### 2. Aesthetics

Under New York law, "aesthetics can be a valid ground for local zoning decisions." Town of Oyster Bay, 166 F.3d at 495; see also Site Acquisitions, Inc. v. Town of New Scotland, 770 N.Y.S.2d 157, 160 (3d Dep't 2003) ("When weighing the extent of intrusion of a proposed facility, the municipality may consider, among other things, the aesthetic impact of a facility."). However, a "few generalized expressions of concern" by residents with respect to aesthetics "cannot serve as substantial evidence on which the [Village] could base the denials." Town of Oyster Bay, 166 F.3d at 496; see also Town of Ramapo, 701 F. Supp. 2d at 461.

The denial issued by the ZBA is clearly based, in large part, on aesthetic concerns. Specifically, the ZBA stated that T-Mobile had failed to offer any justification for "why an acknowledged eyesore in the community should be made worse" by the addition of T-Mobile's Proposed Facility. (App. 957.) According to the ZBA,

> [t]he existing negative aesthetic impact of the Building upon surrounding Village neighborhoods should not be exacerbated. As is, the Building is completely out of character with the Village. What [T-Mobile] request[s] is Board approval to worsen a continuing adverse effect and/or negative impact in neighborhood aesthetic conditions.

(App. 959.)

In reaching its Decision, the ZBA rejected the evidence offered by T-Mobile to support its claim that the addition of its Proposed Facility would have a de minimus impact on the aesthetics of the existing Premises.  (App. 950-51.)  During the ZBA hearings, T-Mobile offered the testimony of Donna Marie Stipo, a member of the American Planning Association, as well as a report prepared by Ms. Stipo, which concluded that T-Mobile's "proposed modifications are visually consistent with the current roof top development and would be a nominal addition that would not exceed the existing established horizon nor alter the current level of visibility of the established visual environs."  (App. 261.)  Included with Ms. Stipo's report were photographs of the existing conditions at the Premises, as well as photographic simulations of how the Premises might appear with the addition of T-Mobile's Proposed Facility.  (App. 256-78.)

In rejecting Ms. Stipo's testimony and report, the ZBA concluded that she "did not . . . in this Board's view, provide a picture that fairly depicts what surrounding residential neighbors will confront if T-Mobile's application is granted."  (App. 950.)  However, the ZBA failed to offer any explanation as to why it did not credit Ms. Stipo's testimony and evidence.  Instead, the ZBA simply relied on photographs submitted by community members, (App. 950), as well as the objections raised by residents concerning the Proposed Facility "being at odds with the Village's character and aesthetic qualities."  (App. 955.)

The ZBA further relied on the testimony offered by the Village's consultant, Richard Comi, that "there are 'stealth' [screening] installations now being used to render rooftop facilities 'extremely less intrusive'" than that proposed by T-Mobile.  (App. 956.)  According to Mr. Comi, T-Mobile's proposed "pole-mounted antennas are not the state of the art for aesthetic

purposes." (App. 956.)  However, Mr. Comi offered nothing to support this conclusion other than his own "opinion," which, according to Mr. Comi, was based on his review of the documents and exhibits prepared with respect to T-Mobile's application as well as visiting the proposed site and driving around the Village.  (App. 655, 666-677.)

In rebuttal to Mr. Comi's testimony regarding stealth screening installations, T-Mobile offered the affidavit of Paul Gartelmann, a licensed architect, along with a letter and calculations prepared by Nicholas DeFelice, a licensed consulting engineer, which stated that "from a structural standpoint the installation of screening material affixed to the existing rooftop bulkheads for the purpose of concealing the existing and proposed antennas is not feasible." (App. 919.)  Mr. Gartelmann explained that "[t]he calculations bear out that the structural capacity of the existing masonry bulkhead walls is exceeded when the wind loads acting upon a screening assembly are applied," and that "it is not feasible to reinforce such masonry wall assemblies."  (App. 919.)  Moreover, although Mr. Gartelmann "explored a variety of measures that could be employed to accommodate such screening assemblies," each of the methods studied "would directly impact existing tenants, necessitating periods of time whereupon a tenant or tenants would not be able to occupy the building."  (App. 919.)  Accordingly, Mr. Gartelmann concluded that Mr. Comi's proposed stealth screening installations were not feasible at the Premises.  (App. 919.)

The record provides little support for the ZBA's conclusion that the construction of T-Mobile's Proposed Facility would have a negative impact on existing aesthetic conditions at the Premises.  The conclusions of Mr. Comi are not supported by any credible evidence.  Moreover, there is no justification offered by the ZBA as to why Ms. Stipo's testimony should be

discounted, particularly since Ms. Stipo concluded that "[w]hat is being proposed is visually consistent with what currently exists." (App. 344.) While the residents of the Village expressed concerns about the aesthetic impact of the Proposed Facility, they "were generalized and failed to identify specific aesthetic problems that the [Proposed Facility] would create." Town of Ramapo, 701 F. Supp. 2d at 462.

Accordingly, the Court finds that the ZBA's Decision that the installation of T-Mobile's Proposed Facility would have a negative aesthetic impact on the areas surrounding the Premises is not supported by substantial evidence.

### 3. Impact on Property Values

The ZBA also denied T-Mobile's application on the grounds that "it seems obvious that having an unsightly commercial building, the largest in the Village, in close proximity to residential homes will have a negative impact upon the marketability and prices of such homes." (App. 959.) The ZBA's Decision appears to be based on concerns raised by community members as well as a petition submitted by local real estate brokers and sales agents, which contended that "the addition of cell antennas and its corresponding equipment . . . will create an eyesore to the residential community as well as affect the real estate values in the village." (App. 567.) According to the petition, "[ha]ving cell antennas that are in their backyards . . . is a major reason not to buy in this community." (App. 567.) The petition, however, was not supported by any concrete evidence; nor did any of the signatories to the petition testify during the ZBA hearings. Nonetheless, the ZBA found that "sellers often rely upon brokers to market their homes, to set asking prices, and develop selling strategies. If many brokers in the Village believe that sale prices will drop if the [Proposed] Facility is installed, it

will be a self-fulfilling prophecy." (App. 959.)

In rendering its Decision, however, the ZBA chose to completely ignore the report introduced into evidence by T-Mobile, which was prepared by Bert Nelson of Bert Nelson Associates, Inc., a real estate appraisal and consulting firm, and which found that "the property values, neighborhood characteristics and pattern of development [in the Village] are well established by the existing conditions and property uses within the area, and the installation of the proposed Communications Facility, a co-location on an existing Building will not adversely affect the community or property values." (App. 229.) In preparing his report, Mr. Nelson relied on studies his firm conducted concerning other wireless facilities on Long Island, as well as a study of the Village itself. (App. 229.) The report concluded that there was "no correlation between the presence of wireless telecommunications antennas and declining property values in the Long Island residential communities [it] studied." (App. 235.) Accordingly, it was Mr. Nelson's professional opinion that T-Mobile's Proposed Facility "will not have an adverse impact or negative effect on the subject property, the surrounding and abutting property values or marketability, and will not adversely affect the character of the district or the community." (App. 235.)

While the ZBA acknowledged that T-Mobile had submitted the foregoing evidence, it appears to have discounted the report because the "consultant did not testify." (App. 959.) According to the ZBA, "[a]s the hearing record demonstrates, when witnesses testify, contradictions of a party's position sometimes arise." (App. 959.) However, the ZBA credited the assertions contained in the petition offered by local real estate brokers and sales agents notwithstanding the fact that none of the signatories to the petition testified either. Moreover, a

review of the record demonstrates that during the July 28, 2009 ZBA hearing, counsel for T-Mobile advised the ZBA that Mr. Nelson was "present . . . should the Board have any questions of him." (App. 508.) The ZBA chose not to question Mr. Nelson concerning the contents of his report.

"Although the ZBA 'is not bound to accept [the applicant's] expert testimony simply because . . . it was insufficiently contested by proper credentialed expert testimony," MetroPCS, 2011 U.S. Dist. LEXIS 6479, at *28 (quoting Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d 529, 533 (2d Cir. 2005)), "[a] few generalized concerns about a potential decrease in property values, especially in light of [the applicant's] contradictory expert testimony, does not seem 'adequate to support a conclusion' . . . that the permits should be denied." Town of Oyster Bay, 166 F.3d at 496 (quoting Universal Camera, 340 U.S. at 477); see also Town of Ramapo, 701 F. Supp. 2d at 463 (finding that the zoning board's decision was not supported by substantial evidence where it "accord[ed] weight to a small number of unspecific, unsupported statements that cell towers adversely affect property values").

Accordingly, the Court finds that the ZBA's determination that it is "obvious" that the construction of T-Mobile's Proposed Facility will adversely affect property values is not supported by substantial evidence.

4.  Need for Coverage

Just like the ZBA's decision in MetroPCS, the ZBA herein denied T-Mobile's application on the grounds that T-Mobile had not demonstrated that there is a need for coverage. According to the ZBA,

the evidence about a gap is equivocal at best, depending upon

-18-

whether T-Mobile's hearing consultants or marketing to the public representations are credited. Further, even T-Mobile's testimonial evidence at the hearing was not clear. Apparently, even in the so-called gap, cell phone calls can be made, received, and maintained . . . Moreover, the record establishes that there are at least two other cell phone providers with installations on the Building. Thus, on this record whether there is a gap in T-Mobile service has not been proven and, even if one may exist, other service providers have installations on the Building.

(App. 958.)

In support of its claim that a significant coverage gap exists, T-Mobile offered multiple affidavits prepared by several radio frequency engineers, Gary Alcon, Mark Cosgrove, and Mark McDiarmid, as well as two propagation maps and test data. Mr. Alcon also testified before the ZBA.

In his initial affidavit, Mr. Alcon states that "[t]here is a serious service deficiency in [T-Mobile's] wireless telephone coverage in the Village . . . evidenced by the inability to adequately transmit or receive calls . . . ." (App. 183.) Attached to Mr. Alcon's affidavit is a propagation map demonstrating T-Mobile's service deficiency. (App. 187.) According to Mr. Alcon, "[t]he deficiency in coverage that exists in the Village prevents [T-Mobile] from providing uniform, reliable, wireless coverage to public and private users, including, but not limited to, police, fire, ambulance, and emergency response services." (App. 183.) Mr. Alcon further states that his "analysis confirms that the [Proposed Facility] will provide reliable coverage for the area in the Village in which [T-Mobile] is experiencing a service deficiency" and attached another propagation map that demonstrates the elimination of T-Mobile's service deficiency by the construction of the Proposed Facility. (App. 184, 189.) Mr. Alcon's affidavit concludes that (1) T-Mobile has a "serious deficiency in . . . communications coverage within the Village"; (2) the

Premises is "the best suited location to provide seamless reliable coverage within the deficiency coverage"; and (3) the effectiveness of the Proposed Facility is "confirmed by computer modeling."  (App. 184.)  Mr. Alcon reiterated his findings during his testimony before the ZBA, stating that the current existing gap in service stretches "north to south, approximately 1.145 miles, and east to west approximately 1.704 miles."  (App. 366-68.)  Mr. Alcon advised the ZBA that T-Mobile's Proposed Facility "will help eliminate the size of [the] existing gap."  (App. 367.)

In opposition, the Village's consultant, Mr. Comi, testified that he had found "some pinpoint areas where [he] see[s] some what [he] would call lack of information, conflicting information, conflicting data that has been provided [by T-Mobile]."  (App. 535.)  Mr. Comi questioned the propagation maps submitted by T-Mobile, asserting that they are not the same maps that are depicted on T-Mobile's website, which demonstrate "quality coverage, good coverage throughout the entire Village."  (App. 650.)  However, when asked, Mr. Comi could not explain how the propagation maps are different, instead simply stating that "the information provided is dramatically different."  (App. 651.)

Mr. Comi also questioned T-Mobile's need for four sectors - "antennas in four different directions" - stating that of the thousands of applications he has done, he could not recall one where he has seen a need for four sectors.  (App. 652-53.)  Although Mr. Comi testified that T-Mobile had provided "no explanation whatsoever" as to why a four-sector design is required, he similarly failed to provide any explanation as to why one is not feasible, other than to state that he "believe[s] it leads . . . to some additional intrusive design characteristics."  (App. 653.)

Finally, Mr. Comi questioned the level of radio frequency emissions that would

accompany the Proposed Facility as well as T-Mobile's decision to construct pipe mounting to mount their antennas instead of more aesthetically pleasing options, both of which have been discussed supra. (App. 654-55.) Mr. Comi also questioned the results of T-Mobiles' Continuous Wave Drive Test data and Bassline Drive Test data, stating that T-Mobile had not, in his opinion, provided complete information. (App. 655-60.) T-Mobile submitted rebuttal evidence in response to each of the "questions" raised by Mr. Comi, which clarified each of his areas of concern. (App. 680-82, 900-18.)

Upon questioning by T-Mobile's counsel, Mr. Comi conceded that he is not a licensed engineer or architect; nor is he a certified planner or appraiser or qualified as a radio frequency engineer. (App. 534-35, 663-64.) While Mr. Comi raised several questions concerning the evidence submitted by T-Mobile, he failed to offer any data or tests to support his claims and conclusions. Moreover, Mr. Comi admitted that although he had been "involved in" a propagation study and a drive test "somewhere in the neighborhood of 1990," he had never personally conducted either. (App. 665-66.) Rather, as stated supra, Mr. Comi simply reviewed the documents and exhibits submitted by T-Mobile, visited the site of the Proposed Facility and drove around the Village, "stopp[ing] at various locations and look[ing] around." (App. 666-67.)

The court's holding in MetroPCS is equally applicable here, particularly in light of the fact that this case involves the same defendants, the same basis for denial of the requested permit and variances, and the same Village witness, Mr. Comi. As the court stated in MetroPCS,

> The ZBA's finding that a [service] gap was not proven because [T-Mobile's] evidence was contradictory is not supported by substantial evidence. Each of the reports and witnesses [T-Mobile] presented to the board testified to the existence of a clearly defined, tested, significant gap in service. The only evidence in the record that

> contradicts the claim is Mr. Comi's testimony. However, a number
> of deficiencies found by Mr. Comi are addressed in the report[s] and
> testimony. Mr. Comi's claim that [T-Mobile's] website depicts a
> coverage map of reliable service in the area is not supported by any
> evidence in the record. Insofar as Mr. Comi disagrees with [T-
> Mobile's] determination of a coverage map, his opinion is not based
> upon any objective evaluations or studies that he described in the
> record.
>
> \*      \*      \*
>
> Although the board is not compelled to rely exclusively on expert
> testimony, a finding which relies on Mr. Comi's unsupported opinion
> to the exclusion of all other witnesses is not based upon substantial
> evidence.

MetroPCS, 2011 U.S. Dist. LEXIS 6479, at *33-34 (citing Omnipoint Holdings, Inc. v. City of

Cranston, 586 F.3d 38, 48-50 (1st Cir. 2009)).[4]

With respect to the ZBA's determination that a service gap has not been established by T-

Mobile because "at least two other cell phone providers . . . have installations on the Building,"

(App. 958), several courts in this circuit have held that "a gap in service under the TCA must be

evaluated from the perspective of the provider." MetroPCS, 2011 U.S. Dist. LEXIS 6479, at *35

(citations omitted); see also Omnipoint Commc'ns, Inc. v. Village of Tarrytown Planning Bd.,

302 F. Supp. 2d 205, 217 (S.D.N.Y. 2004). "To find otherwise would require the TCA to

compel a local zoning board to permit the first applicant to build wireless antennas for a region,

but allow the board to deny all subsequent applicants to that region on the ground that the

---

[4] The Court notes that at least one other court has found Mr. Comi's unsupported
testimony insufficient to sustain a finding of substantial evidence. In Nextel West Corp. v. Town
of Edgewood, 479 F. Supp. 2d 1219 (D.N.M. 2006), wherein the court found that the denial of
Nextel's application to collocate a wireless facility violated the TCA, the court stated that "Mr.
Comi's rambling and anecdotal narratives during the town council's hearings on Plaintiff's
application do not support a reasonable inference that Defendants' written decision denying the
application was supported by substantial evidence in the written record . . . ." Id. at 1240.

existence of any provider precludes finding a coverage gap." MetroPCS, 2011 U.S. Dist. LEXIS 6479, at *35-36. T-Mobile's evidence sufficiently demonstrated a service gap within the Village.

Accordingly, the Court finds that the ZBA's denial of T-Mobile's application on the grounds that T-Mobile has not established a need for coverage is not supported by substantial evidence.

### 5. Alternative Technologies

The Village attempts to justify its denial of T-Mobile's application on the grounds that the ZBA properly took into account Mr. Comi's testimony regarding a less intrusive technology known as a distributed antenna system ("DAS"), which Mr. Comi described as a series of smaller antennas that can be installed on street lights and traffic lights. (Def. Mem. of Law 20; App. 660-61.) According to the Village, the ZBA denied T-Mobile's application to construct its Proposed Facility "because there is evidence establishing that a service gap, assuming arguendo that there is one, can be closed by less intrusive means. (Def. Mem. of Law 21.)

A review of the ZBA's Decision, however, reveals no stated reliance on alternative or less intrusive technologies in the "Determination" section of the Decision. (App. 957–60.) In fact, the Court is unable to find mention of DAS anywhere in the Decision, including in the "Findings of Fact" section. Accordingly, since the Decision does not deny T-Mobile's application based on the availability of less intrusive technology, such as DAS, it cannot serve as substantial evidence upon which the ZBA based its decision.

For the foregoing reasons, the Court finds that the ZBA's Decision to deny T-Mobile's application for height and use variances as well as a special exception permit is not supported by

substantial evidence.  Accordingly, T-Mobile should be granted summary judgment with respect to this claim.

B. The ZBA's Decision Unreasonably Discriminates Against T-Mobile

 Pursuant to the TCA, state and local governments are prohibited from "unreasonably discriminat[ing] among service providers of functionally equivalent services" with respect to the placement, construction and modification of personal wireless service facilities.  47 U.S.C. § 332(c)(B)(i)(I); see also Willoth, 176 F.3d at 638; Town of Lagrange, 658 F. Supp. 2d at 561.  To succeed on such a claim, a plaintiff "must show that a defendant discriminated among service providers of functionally equivalent services and that the providers were treated unequally."  Town of Lagrange, 658 F. Supp. 2d at 561 (citing Nextel Partners of Upstate N.Y., Inc. v. Town of Canaan, 62 F. Supp. 2d 691, 698 (N.D.N.Y. 1999)).  "Although the TCA explicitly contemplates that some discrimination among providers of functionally equivalent services is allowed, such discrimination must be reasonable."  Town of Lagrange, 658 F. Supp. 2d at 561 (citing cases); see also Willoth, 176 F.3d at 638 ("The Act explicitly contemplates that some discrimination among providers of functionally equivalent services is allowed.  Any discrimination need only be reasonable.").

 "It should be noted that the TCA does not require the ZBA to allow an unlimited number of wireless antennas on a structure where they have already approved a single antenna."  MetroPCS, 2011 U.S. Dist. LEXIS 6479, at *40.  Rather, "[t]he phrase 'unreasonably discriminate among provider of functionally equivalent services' . . . provide[s] localities with the flexibility to treat facilities that create different visual, aesthetic, or safety concerns differently to the extent permitted under generally applicable zoning requirements even if those facilities

provide functionally equivalent services." Willoth, 176 F.3d at 639.

Here, it is undisputed that there are already two Village-approved public utility wireless telecommunications facilities located at the Premises: (1) three antennas mounted on three mounts by Sprint and (2) nine antennas mounted on six mounts by Verizon, both of which provide service functionally equivalent to T-Mobile. (Pl. 56.1 ¶ 16.) It is further undisputed that in 2001, the Village approved an application by Nextel to construct a facility comprised of twelve roof-mounted antennas with related equipment housed in the basement of the Premises. (Pl. 56.1 ¶ 17.) Nextel, however, chose not to move forward with the construction of its facility. (Pl. 56.1 ¶ 18.) All three service providers - Sprint, Verizon and Nextel - were granted height variances by the Village in order to install their antennas on the roof of the Premises. (Pl. 56.1 ¶ 19.)

The evidence produced by T-Mobile establishes that it seeks to install eight antennas mounted on six mounts on the roof of the Premises with related electrical equipment to be placed in the basement - less than the number of antennas already approved by the Village for Verizon and Nextel. Moreover, T-Mobile's Proposed Facility will contain antennas of various heights, with the top of no antenna extending higher than the existing antennas already placed there by Sprint and Verizon. (Pl. 56.1 ¶ 20.) As Ms. Stipo's report and testimony concluded, the "proposed modifications are visually consistent with the current roof top development and would be a nominal addition that would not exceed the existing established horizon nor alter the current level of visibility of the established visual environs." (App. 261.)

Moreover, although the Village would like the Court to disregard Nextel's approved application as "irrelevant," it is in fact quite relevant. (Def. Mem. of Law 12.) When made aware of the prior approval to Nextel during the hearings held before it, the ZBA responded

"[t]hat was then and this is now." (App. 352.) Yet, the ZBA offers no explanation as to how T-Mobile's application is any different than Nextel's or how it would adversely affect the aesthetics of the environment in a way that Nextel's application would not have done. In fact, the Village appears to ignore the fact that T-Mobile's application is virtually identical to Nextel's except that T-Mobile actually proposes to install fewer antennas than were approved in Nextel's application. As the court in MetroPCS found when confronted with the identical issue raised here, "there is not substantial evidence in the record demonstrating in what way [the plaintiff's] application creates different visual, aesthetic, or safety concerns from Nextel's application, which was granted, and therefore, the ZBA's denial of this application unreasonably discriminated against [the plaintiff]." MetroPCS, 2011 U.S. Dist. LEXIS 6479, at *40.

For the foregoing reasons, the Court finds that the Village impermissibly discriminated against T-Mobile and that T-Mobile is entitled to summary judgment on this cause of action.

C.     The ZBA's Decision Effectively Prohibits Service by T-Mobile

This action is a classic example of the "Not In My Backyard" attitude that is all too prevalent in the manner in which some municipalities consider these applications and precisely the reason that Congress was compelled to enact the TCA. "A municipality cannot prohibit, or make decisions that have, the effect of prohibiting[] personal wireless services." Town of Lagrange, 658 F. Supp. 2d at 558 (citing 47 U.S.C. § 332(c)(7)(B)(i)(II)). The Second Circuit has interpreted this provision to "preclude[] denying an application for a facility that is the least intrusive means for closing a significant gap in a remote user's ability to reach a cell site that provides access to land-lines." Willoth, 176 F.3d at 643. Under the standard enunciated by the Second Circuit, "a plaintiff will prevail on a [prohibition of service] claim if its shows both

that a 'significant gap' exists in wireless coverage and that its proposed facility is 'the least intrusive means' to close that gap." <u>Town of Ramapo</u>, 701 F. Supp. 2d at 456 (citing <u>Willoth</u>, 176 F.3d at 643).

As discussed <u>supra</u> at pages 18 to 23, in connection with T-Mobile's claim that the ZBA's Decision is not based on substantial evidence, T-Mobile has sufficiently demonstrated that a significant gap in service exists within the Village and has accordingly satisfied the first prong of a prohibition of service claim. With respect to the second prong, "[w]here the plaintiff's existing proposal is the only feasible plan to close the relevant coverage gap, it seems evident that no less intrusive means is possible, and the application must be granted." <u>Town of Ramapo</u>, 701 F. Supp. 2d at 457. T-Mobile has amply demonstrated that its Proposed Facility is the most feasible means of eliminating its service gap in the Village.

Specifically, it is undisputed that the Village is primarily a residential area with limited commercial development along Glen Cove Road. (App. 947.) Aside from the Premises upon which T-Mobile seeks to construct its Proposed Facility, the small commercial area consists mainly of one and two story buildings. (App. 238.) Prior to applying for the variances and permit necessary to construct its Proposed Facility, T-Mobile proposed collocating antennas on the Tower located on Village property; however, the Village was not open to T-Mobile's proposal. (App. 284-87.) Accordingly, as discussed <u>supra</u> at pages 9 to 23, in connection with T-Mobile's claim that the ZBA Decision is not based on substantial evidence, the evidence during the ZBA hearings demonstrated - and to which the Village has offered nothing contradictory - that the Premises is the only feasible location for the construction of T-Mobile's Proposed Facility. This fact is demonstrated even further by the fact that other wireless service

providers - Sprint and Verizon - already maintain Village-approved facilities on the Premises.

For the foregoing reasons, the Court finds that "[w]ithout any dispute about the presence of a significant coverage gap or the unique feasibility of T-Mobile's plan, no triable issues of material fact remain on T-Mobile's effective-prohibition cause of action." Town of Ramapo, 701 F. Supp. 2d at 460. Accordingly, the Court finds that T-Mobile is entitled to summary judgment on this claim.

      D.    <u>The Article 78 Claim</u>

Since the Court finds that T-Mobile is entitled to a judgment as a matter of law on its TCA claims, "decision on the Article 78 claim is unnecessary." <u>MetroPCS New York, LLC</u>, 2011 U.S. Dist. LEXIS 6479, at *40-41 (citation omitted).


IV.    <u>Remedy</u>

Although the TCA "does not specify a remedy for violations of the cellular siting subsection," . . . the majority of district courts that have heard these cases have held that the appropriate remedy is injunctive relief in the form of an order to issue the relevant permits." <u>Town of Oyster Bay</u>, 166 F.3d at 497 (collecting cases). Accordingly, the Court recommends that the Village be ordered to grant T-Mobile the requested variances and permit necessary to construct its proposed wireless communications facility.


V.    <u>Attorney's Fees and Costs</u>

The Court notes that in their opposition to the within motion, defendants argue that T-Mobile is not entitled to any damages, attorney's fees or costs. (Def. Mem. of Law 28-31.)

However, as T-Mobile points out in its Reply Memorandum of Law, it did not request any such relief in either the Complaint or the within motion. Accordingly, there is no need to address the issue of damages raised by defendants.

RECOMMENDATION

For the foregoing reasons, the plaintiff's motion for summary judgment should be granted and an injunction ordering the defendants to issue the requested height and use variances and special exception permit required for plaintiff to begin construction on its proposed telecommunications facility should be imposed.

OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Any written objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further appellate review. Thomas v. Arn, 474 U.S. 140, 145 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 299-300 (2d Cir. 1992).

**SO ORDERED:**

Dated: Central Islip, New York
      March 2, 2011

                        /s/ E. Thomas Boyle          
                        E. THOMAS BOYLE
                        United States Magistrate Judge